IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 113,235

In the Matter of RUSTIN K. RANKIN,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed June 12, 2015. Disbarment.

*Alexander M. Walczak*, Deputy Disciplinary Administrator, argued the cause, and *Kate F. Baird*, Deputy Disciplinary Administrator, and *Stanton A. Hazlett*, Disciplinary Administrator, were on the formal complaint for the petitioner.

*John J. Ambrosio*, of Ambrosio & Ambrosio, Chtd., of Topeka, argued the cause, and *Rustin K. Rankin*, respondent, argued the cause pro se.

*Per Curiam*: This is an attorney discipline proceeding against Rustin K. Rankin, of Fredonia, an attorney admitted to the practice of law in Kansas in 1999.

On August 12, 2014, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent answered on September 4, 2014, admitting some allegations and denying others.

A panel of the Kansas Board for Discipline of Attorneys held a hearing on October 29 and 30, 2014, at which the respondent appeared in person and through counsel. The hearing panel determined the respondent violated KRPC 1.5(a) and (b) (2014 Kan. Ct. R. Annot. 515) (fees); 1.7(a)(2) (2014 Kan. Ct. R. Annot. 531) (conflict of interest); 1.8(a)

1

(2014 Kan. Ct. R. Annot. 542) (conflict of interest); 1.15(a) (2014 Kan. Ct. R. Annot. 567) (safekeeping property); and 8.4(c) (2014 Kan. Ct. R. Annot. 680) (engaging in conduct involving misrepresentation) and (g) (engaging in conduct adversely reflecting on lawyer's fitness to practice law).

Upon conclusion of the hearing, the panel made the following findings of fact, conclusions of law, and disciplinary recommendation. The respondent took no exceptions to the hearing panel's report. We quote the report's pertinent parts below.

"*Findings of Fact*

. . . .

"7.      In addition to practicing law, the respondent is involved in a family farming operation, Rankin Family Farms. The respondent's family farms land near Fredonia, Kansas.

"8.      In 2006, a representative from Wells Fargo contacted the respondent and asked him if he would serve as the closing agent in a real estate transaction. The real estate transaction involved P.M.'s purchase of 360 acres of property in Benedict, Kansas. At that time, P.M. was a 73-year-old widow. The respondent met P.M. for the first time at the closing.

"9.      Following that contact, the respondent and P.M. discovered that they had many things in common. During the period of time that followed, P.M. engaged the respondent as her attorney, they became friends, and they became business associates. On a number of occasions, the respondent and his family traveled on vacations with P.M. Respondent testified he grew to care more for P.M. than his own mother. [Footnote: P.M. testified at the hearing on the formal complaint. She was 82 years old at the time. P.M. suffered an injury in her home in August 2014, and was still in the process of recovering from the injury. The respondent objected to her testimony on the grounds of

2

competency. The competency objection was overruled. P.M. was unable to recall many facts but despite having a faulty memory contributed to by age and physical maladies, she appeared to understand her duty to tell the truth and she was capable of expressing herself to the hearing panel and counsel. However, the hearing panel has placed little weight on P.M.'s appearance, as it was apparent P.M.'s physical and mental capacities had significantly deteriorated since P.M.'s attorney-client and business relationships with her from 2007 through 2012.]

"10. In 2007, the respondent became P.M.'s attorney. The respondent did not send P.M. an engagement letter. There is no evidence that the respondent communicated the rate of his attorney fees to P.M.

"11. On October 10, 2008, the respondent drafted and P.M. executed a limited power of attorney, in favor of the respondent. The power of attorney granted the respondent extensive authority to act on behalf of P.M.

"12. On June 1, 2009, P.M. provided the following written statement:

'To Whom It May Concern:

'I, [P.M.], have chosen to enter into a business relationship with my friend Rustin Rankin. I have not been forced or coerced into this relationship and enter it with a sound and clear mind. Over the past several years, Mr. Rankin has helped me in numerous ways and I trust him fully and completely. He has advised me that it is my right to consult with another attorney regarding this relationship and have now decline [*sic*] to do that. I understand that large sums of money will be involved in this partnership and will be transferred from time to time. It is my desire to allow these transactions and have communicated my wishes to Mr. Rankin and I believe that he has a clear understanding of them.

'We will be engaged in property management as well as various farming and ranching pursuits. I clearly understand that I will be contributing

3

more capital to our project and Mr. Rankin will be providing more management and oversight. I believe this to be fair and reasonable. I have known Mr. Rankin and his family for several years and have always enjoyed a fair and beneficial relationship.'

"13.    At some point in time, P.M. created an entity called Madden Ventures. P.M. opened a checking account for the entity at the First National Bank in Fredonia . . . . The first check written on [the] account . . . was written by the respondent on April 24, 2009. (A typographical error occurred and checks were issued under the name Madden Adventures. Any references to Madden Adventures in the record should be recognized as synonymous with Madden Ventures. Later, Madden Ventures evolved into Madden Ventures, LLC.)

"14.    On July 15, 2009, the respondent obtained a personal loan for $15,000 from P.M. The respondent repaid P.M. with $7,500.00 in cash and $7,500 in 'in kind services.' (The respondent stipulated that he violated KRPC 1.8 when he obtained the loan from P.M.)

"15.    P.M. wished to own property located near the Rankin Family Farm property.  Thereafter, a neighbor to the Rankin Family Farm property offered to sell 75 acres (the 'Donahey property') to the respondent and his family for $125,000. On October 1, 2009, the respondent and his brother purchased the property using $125,000 from P.M.

"16.    Immediately after purchasing the Donahey property, the respondent and his brother sold the property to Madden Ventures for $125,000. Further, the respondent and his brother had an agreement with P.M. that if she chose to sell the Donahey property at a future date, she would sell it to the respondent and his brother for the same purchase price, $125,000.

"17.    There was no closing statement offered into evidence to prove the financial transaction wherein the respondent and his brother, Richard Rankin, sold the property to Madden Ventures. However, the following financial transactions do evidence the same.

4

a. On September 22, 2009, the respondent caused to be transferred, the sum of $75,000 from P.M.'s Individual Retirement Account (hereinafter 'IRA') funds . . . unto [*sic*] the Madden Adventures account . . . .

b. On September 22, 2009, the respondent caused $50,000 from the Madden Adventures account . . . to be transferred to and deposited in the Rankin Law Offices Trust Account . . . .

c. On October 2, 2009, the respondent caused a check of $140,000 to be written on [the Madden Adventures] account . . . and deposited in the Rankin Law Offices Trust Account. . . .

d. On October 22, 2009, the respondent caused to be transferred the sum of $125,000 from P.M.'s IRA . . . unto [*sic*] the Madden Adventures account. . . .

"18. In addition, the respondent testified that the funds ($125,000) went from P.M.'s IRA account to the Madden Adventures account to Rankin Law Offices Trust Account to the sellers, Donahey.

"19. On October 7, 2009, the respondent formally established a limited liability company with P.M., called Madden Ventures, LLC. The respondent and P.M. were each 50% owners of Madden Ventures, LLC. Additionally, there is evidence and testimony that the parties formed a business relationship and acted as partners prior to this date.

"20. P.M. contributed all the capital to Madden Ventures, LLC, including the proceeds from an IRA. Additionally, the respondent effected the transfer of real property, located in Kansas and elsewhere, owned by P.M. to Madden Ventures, LLC. (The respondent stipulated that he violated KRPC 1.8 by transferring his client's property to an entity in which he was an owner.)

5

"21.     Despite the 50% ownership interest, the respondent did not contribute any capital to Madden Ventures, LLC. Likewise, the respondent did not transfer any of his real property into Madden Ventures, LLC. Respondent testified his contributions to Madden Ventures, LLC, were his management skills and his financial standing enabling him to guarantee loans for the LLC. Thus, with regard to the Donahey property, notwithstanding that respondent was the seller, settlement agent, and attorney for P.M., the respondent also acquired an ownership interest in the Donahey property as a buyer because of his 50% interest in Madden Ventures LLC.

"22.     Madden Ventures, LLC, purchased additional real property, which included working farm land, established a cattle ranching operation, and received income from a hunting lease. P.M. built a house on a portion of the real property owned by Madden Ventures, LLC.

"23.     P.M. informed the respondent that she wished to make a change to her will and leave all her property upon her death to the respondent. The respondent informed P.M. that he could not draft a new will for her which named him as her heir. The respondent referred P.M. to John Chenoweth, a local attorney. P.M. consulted with Mr. Chenoweth and on November 24, 2009, P.M. executed a new will, naming the respondent as the executor and sole heir of her estate upon her death. The respondent paid Mr. Chenoweth's bill and then sought reimbursement from P.M.

"24.     Respondent testified he was reluctant to be the sole beneficiary of P.M.'s will because, 'He had enough money.'

"25.     From the time the respondent formed Madden Ventures, LLC, and continuing into 2012, the respondent maintained money belonging to Madden Ventures, LLC, in his attorney trust account. Additionally, throughout that same time period, the respondent was a 50% owner of Madden Ventures, LLC.

"26.     At the hearing on the formal complaint, the respondent testified that he stopped providing P.M. with legal services at the end of 2009.  However, the record does not support the respondent's testimony. The respondent continued to engage in activity on

6

behalf of P.M. which constitutes the practice of law. Further, the respondent continued to deposit funds of Madden Ventures, LLC, owned by himself and P.M., into his attorney trust account, and continued to write checks on behalf of P.M. from his attorney trust account until sometime in 2012. At no time, did the respondent notify P.M. that he was no longer acting as her attorney.

"27.     P.M.'s accountant, Joe Bambrick, had been receiving and paying P.M.'s bills for her. In April or May, 2010, the respondent's law office took over that role and began receiving and paying P.M.'s bills for her.

"28.     On November 10, 2010, P.M. executed an IRA Change of Beneficiary form, changing the primary beneficiary of her IRA to Madden Ventures, LLC. On November 15, 2010, P.M. added the respondent as a user on two of her credit cards with Chase Bank.

"29.     In 2011, at P.M.'s request, the respondent transferred the ownership of the 360 acres in Benedict, Kansas, to Madden Ventures, LLC.

"30.     In December, 2011, the respondent, his family, and P.M. went on a Christmas cruise. Following the cruise, P.M. and the respondent had a falling out. According to the respondent, following the cruise, P.M. wanted the respondent and his family to travel to Tampa, Florida, to inspect a condominium which she wished to purchase. The respondent advised P.M. against the purchase. Additionally, the respondent refused to travel to Tampa because he and his family were tired from the cruise. P.M. went to Tampa and the respondent and his family returned home. Following his return home, (other than during her testimony at the formal hearing), the respondent saw P.M. on only one additional occasion, at a chance meeting in the grocery store.

"31.     On January 19, 2012, without P.M.'s knowledge or permission, the respondent executed a contract, effecting the transfer of the Donahey property from Madden Ventures, LLC, to the respondent. Further, the respondent's law office was listed as the escrow agent. The respondent was a member of the seller, Madden Ventures, LLC, he was the buyer, and he acted as agent for the buyer. On the contract, the respondent

7

signed as both the seller and the buyer. The respondent received $110,000 upon the closing of the sale.

"32. On February 1, 2012, the respondent and his brother borrowed $600,000 to refinance the Rankin Family Farm operation. According to the settlement sheet, two loans were paid off, totaling $74,968.89. The purchase of the Donahey land was included in the loan. It appears that the respondent received $125,000 in cash from the transaction to pay to Madden Ventures, LLC, for the Donahey property.

"33. The Settlement Statement and supporting documents for the $600,000 loan contained the following language:

'Contingent Liabilities: Rustin is a 50/50 partner in Madden Ventures, LLC. This is basically a R/E company that owns several condos in 4 states and farmland around Longton Kansas. Rustin's partner is an older widowed lady by the name of [P.M.]. She and Rustin became business partners a few years back (basically because she took a liking to Rustin's Family vs. her own) and Rustin has basically invested nothing, and been made partner at 50/50. Total debt on the LLC is $290,000 in MTG loans on 3 properties that rent covers in full so Rustin has no out of pocket expense and a $1.25m IRA that could be cashed out at any time to fulfill obligations if need be owned by [P.M.]. Madden Ventures has assets of roughly $2,650,000 that Rustin is half owner of but is not counted Net Worth for this request, simply additional peace of mind on capital strength for this credit package.'

"34. On March 17, 2012, P.M. wrote to the respondent. The letter provided:

'Dear Rustin:

'I am very concerned and disappointed with our current situation. I have requested time and again to be advised about my financial affairs. You have not kept me informed in any way concerning my finances. I do not

8

know how much cash I have available for my personal use and this sometimes creates embarrassing situations for me. I have found myself without even funds on my credit card. You are not keeping me informed when you make a business decision or purchase. You do not send me any financial statements. I do not know how much I have paid in taxes. I don't know how much I am paying you.

'Therefore I plan to hire a CPA to obtain this information and relay it to me in a timely manner.

'Rustin, I appreciate all you have done for me and there would not be a problem if you would just keep me "in the loop" and not do things without discussing them with me first. After all, just like you told Wells Fargo, it is my money. And since I am not senile yet I want to know what is going on.

'I further wish to revoke the power of attorney that I gave you over my affairs and well being. I find I no longer trust your motives and wonder if you really have my best interests at heart. I want proof that this has been done. I would like it to be effectively immediately on recipt [*sic*] of this letter.

'Please send copies of the paperwork for my Madden Ventures LLC and my living trust to my Mailbox Etc. in Corpus Christi. Send this registered with a return receipt request.

'Just because I put your name on my checking accounts does not give you the right to write checks and purchase items, services without informing me first.

'There will have to be some changes made in order for us to consider a future business relationship.'

9

"35.    In an undated letter, the respondent responded to P.M.'s March 12, 2012, [*sic*] letter. (In the body of the letter, the respondent stated that he received her letter 'yesterday.' Thus, it appears that the respondent's undated letter was written shortly after receiving P.M.'s March 12, 2012, [*sic*] letter.) With his response, the respondent enclosed a revocation of power of attorney.

"36.    In the response, the respondent stated that he 'quit charging [P.M.] any attorney's fees when [their] relationship went from attorney/client to friends about 3 years ago. [He] couldn't charge one of [his] best friends.' About 3 years' prior would be March 2009. The record is replete with evidence that the respondent charged P.M. attorney fees throughout 2009.

"37.    In a nine (9) month period from April 2009 to December 2009, the respondent transferred $498,820.57 from Madden Ventures, LLC's account into the respondent's trust account or to himself personally, for legal fees, expenses associated with operation of Madden Ventures, LLC, a loan to the respondent, or for reasons not documented on a check.

"38.    Further, the respondent's statement in his letter varied from his testimony at the hearing on the formal complaint. In that, he testified that he stopped representing her following 2009 but in his letter he stated that he stopped billing her for the representation.

"39.    Additionally, the respondent's billing records from his law office to P.M. and Madden Ventures, LLC, indicate that the respondent charged Madden Ventures, LLC, at least $60,000 in retainers for legal services in 2010, as follows:

'January 6, 2010       Madden Ventures, LLC $20,000
January 25, 2010      Madden Ventures, LLC $10,000
March 4, 2010         Madden Ventures, LLC $10,000
April 16, 2010        Madden Ventures, LLC $10,000
May 21, 2010          Madden Ventures, LLC $10,000'

All of the above bills were billed to Madden Ventures, LLC, c/o Rankin Law Offices, P.O. Box 425, Fredonia, Kansas 66736.

"40.     At the hearing on the formal complaint, the respondent explained that despite his records, he did not provide legal services to P.M. in 2010. He asserted that the $60,000 was for restaurant consulting fees and that his legal assistant 'mislabeled' the services on the invoices. Further, the respondent testified that he instructed his legal assistant to create the invoices in 2012, to account for monies received by him from P.M., as documentation of income for tax purposes. The respondent testified that he had failed to report $60,000 of income and therefore needed the bills to account for income so he could file an amended tax return. The creation of the bills occurred after P.M. had sent Disciplinary Administrator's Exhibit 4 to the respondent. The respondent never provided P.M. with a copy of the invoices found in Disciplinary Administrator's Exhibit 13, pp. 192-96. No restaurant was ever opened by P.M.

"41.     The memo line of the checks does not indicate that it was restaurant consulting fees. Rather, on two of the five checks, the respondent noted 'transfer' in the memo line. On the other three, the respondent made no notation. The respondent's notation of 'transfer' was common to many of the checks he wrote to his law office from the Madden Adventures account; 10 additional checks are noted in the same fashion.

"42.     Other than the respondent's testimony, there is no other evidence in the record that the payments were for restaurant consulting fees. The hearing panel finds the respondent's testimony that the $60,000 was for restaurant consulting fees, rather than legal fees, to lack credibility. The respondent possessed no unique skills or experience to act as a restaurant consultant. The respondent maintained no record of his time associated with his restaurant consulting services, although he did indicate he gave records of his time to P.M. Based on all the evidence, the hearing panel finds that the invoices were for what they state that they were for—legal services or were simply a transfer of funds to the respondent for no reason other than the personal financial benefit of the respondent.

11

"43.     On April 24, 2012, the respondent self-reported misconduct in connection with his representation of P.M. to the disciplinary administrator. The respondent's letter provides:

'I feel it is my obligation to file a report to your office about my potential ethical lapses that have been made. They are in regard to a client I had named [P.M.]

1.     I failed to have a proper engagement letter with [P.M.].

2.     I failed to have a proper disengagement letter with [P.M.].

3.     I failed to write a letter explaining to [P.M.] that I would not do her taxes for her for the years 2009 and 2010.

4.     I drafted an LLC for a client in which I am a partner and this was not an arms [*sic*] length transaction in that she did not obtain separate legal counsel.

5.     I drafted deeds that transferred property of a Client's into an LLC in which I am a partner and this was not an arms [*sic*] length transaction in that she did not obtain separate legal counsel.

6.     I accepted a loan from [P.M.], drawn on an account that I was a co-owner, and [P.M.] was a client at the time.

'I look forward to hearing from you in this matter so that it can be resolved.'

"44.     In May, 2012, after accounting for disbursements, the respondent held $169,653 of P.M.'s money, which could not be accounted for by the respondent.

12

"45.     On March 13, 2014, P.M. filed a federal district court lawsuit against the respondent. In the suit, P.M. alleged that the respondent engaged in legal malpractice under the theories of breach of fiduciary duty, conflict of interest, breach of trust, wrongful conversion, and negligence. Without admitting liability or any wrongdoing, the respondent settled the suit with P.M. in the amount of $150,000. The respondent contributed $50,000 and the respondent's malpractice carrier paid the remaining $100,000 of the settlement amount. At the hearing on the formal complaint, the respondent testified that he agreed to pay $50,000 because it was a 'fair and reasonable approximation of the potential risk [he] stood.'

"46.     At the hearing on this matter, the respondent's testimony was inconsistent. Further, the respondent's testimony was inconsistent with his answer to the formal complaint. Specifically, in his answer, the respondent admitted that he has been unable to provide an adequate accounting of the funds held for P.M. In contrast, during questioning by Mr. Cohen, the following exchange occurred:

'Q.     (BY MR. COHEN) Look at paragraph 29. It alleges that not less than $594,150 of [P.M.]'s money was transferred to accounts of Madden Ventures, LLC or Rustin Rankin or Rankin Law Offices and that you have been unable to provide an adequate accounting of funds held for [P.M.] to her or the Disciplinary Administrator. . . . Is that correct?

. . . .

'A.     [BY THE RESPONDENT] I would say that it is—I would say that it is an adequate accounting. We have an accountant. We've accounted for all the checks. I think the question comes down to invoices that I wouldn't have or would have in my possession. But it's my understanding that all that money has been accounted for and we've slotted it into wherever it went.'

"47.    The respondent retained a CPA, Thomas H. Sewell, to review P.M.'s accounts. Mr. Sewell provided an Independent Accountants' Report on Applying Agreed Upon Procedures for the year ending December 31, 2009. Mr. Sewell did not conduct an audit. In the report, Mr. Sewell determined that there were 'uninvoiced amounts' of $65,364.27. *But see* paragraph 44.

"48.    Mr. Sewell reviewed the deposits and checks for the year 2009 for P.M.'s personal checking account . . . and the Madden Adventures checking account, . . . both with the First National Bank in Fredonia.

"49.    As to [P.M.'s personal checking] account . . . , Mr. Sewell found that checks were written to the Rankin Law Office trust account totaling $20,000 and there was no supporting documents for the payments.

"50.    Total deposits/receipts made to [the Madden Adventures] account . . . by the respondent for 2009 were $521,710.57. Disbursements and checks totaled $521,330.39, leaving an ending balance of $380.18 on December 31, 2009. Of the $521,330.39 in disbursements, the sum of $173,820.57 [was] written to the respondent and the sum of $329,000 was written to the Rankin Law Office trust account.

"51.    Mr. Sewell examined the payments made to the respondent and the Rankin Law Office trust account through [P.M.'s personal checking account] and [the Madden Adventures account]. The total payments to the respondent or the Rankin Law Office trust account were $522,820.57. Of that amount, P.M. was invoiced for $41,116.98 in attorney's fees and expenses, P.M. was invoiced for $124,308.66 (which represents the purchase of the Donahey property by Madden Ventures LLC) and P.M. was invoiced for other moving, farm and ranch and house expenses. The sum of $65,364.27 represents the 'Uninvoiced Amounts'. This amount does include the $20,000 discussed above.

"52.    There was no evidence from the Disciplinary Administrator that these funds were used inappropriately. Conversely, there was no evidence that the respondent could account for the funds.

14

"53.     Based upon the findings of fact, the hearing panel concludes as a matter of law that the respondent violated KRPC 1.5, KRPC 1.7, KRPC 1.8, KRPC 1.15, and KRPC 8.4, as detailed below.

"KRPC 1.5

"54.     Lawyers must charge reasonable fees. KRPC 1.5(a). In this case, the respondent failed to charge reasonable fees. Applying the factors in KRPC 1.5(a)(1)-(8), there is no way for the respondent to reasonably account for the amount of fees assessed to P.M. In one attempt to justify fees charged or to try to account for money transferred to him, the respondent created invoices approximately 2 years after the work was purportedly done. The respondent charged P.M. $60,000 and provided no written documentation for what work was being billed for, nor did he ever provide the invoices to his client. As stated above, the hearing panel finds the respondent's testimony that the $60,000 was for restaurant consulting fees to lack credibility. Moreover, the $60,000 came out of his attorney trust account. Charges for a total of $60,000 without explanation is *per se* unreasonable. The cavalier attitude shown by the respondent during his testimony about a substantial amount of money being paid to him, unbeknownst to his client and business partner, causes the hearing panel to place little weight on his attempt to explain the total mismanagement of his trust account and P.M.'s money. Accordingly, the hearing panel concludes that the respondent violated KRPC 1.5(a) by charging P.M. an unreasonable fee.

"55.     KRPC 1.5 also requires lawyers to communicate the basis of the fee to a client, when the lawyer has not regularly represented the client.

'When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation.'

15

KRPC 1.5(b). In this case, the respondent admitted that he failed to provide an engagement letter to P.M. Based upon the respondent's admission that he failed to provide P.M. with an engagement letter and the lack of other evidence establishing that the respondent otherwise communicated the rate of his fee to P.M., whether it was for legal services or the nebulous restaurant consulting fee, the hearing panel concludes that the respondent violated KRPC 1.5(b).

"KRPC 1.7

"56.     In this case, the respondent represented P.M. when he had a concurrent conflict of interest, in violation of KRPC 1.7. According to KRPC 1.7(a)(2), a concurrent conflict of interest exists if there is 'a substantial risk that the representation of one or more clients will be materially limited by . . . a personal interest of the lawyer.' There was a substantial risk that the representation of P.M. would be materially limited by the respondent's own interests after the respondent became business partners with P.M., the sole heir under her will, and the beneficiary of her IRA.

"57.     In order to continue to represent P.M. following the existence of the conflict, the respondent had to take certain steps, identified in KRPC 1.7(b):

'Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1)     the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2)     the representation is not prohibited by law;

(3)     the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

16

(4)     each affected client gives informed consent,
        confirmed in writing.'

Although Disciplinary Administrator's Exhibit 7 could be construed as P.M.'s informed consent, confirmed in writing, the record is replete with transactions that clearly show respondent's representation of P.M., as her attorney, was materially limited by respondent's personal interests to financially benefit from his unfettered access to, and use of, P.M.'s assets. Further, P.M.'s March 17, 2012, letter clearly establishes that the respondent failed to properly inform P.M. as to the business transactions. As such, based on the totality of the circumstances, the hearing panel concludes that the respondent violated KRPC 1.7(a)(2).

"KRPC 1.8

"58.    KRPC 1.8(a) limits the types of relationships an attorney can enter with clients:

'A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1)     the transaction and terms on which the lawyer
        acquires the interest are fair and reasonable to
        the client and are fully disclosed and transmitted
        in writing to the client in a manner which can be
        reasonably understood by the client; and

(2)     the client is advised in writing of the desirability
        of seeking and is given a reasonable opportunity
        to seek the advice of independent legal counsel
        on the transaction; and

17

(3)    the client gives informed consent, in a writing
       signed by the client, to the essential terms of the
       transaction and the lawyer's role in the
       transaction, including whether the lawyer is
       representing the client in the transaction.'

The respondent stipulated that his conduct violated KRPC 1.8(a) in two respects. First, the respondent stipulated that he violated KRPC 1.8(a) by receiving a loan of $15,000, from P.M. Second, the respondent stipulated that he violated KRPC 1.8(a) by transferring P.M.'s property into Madden Ventures, LLC, in which he was an owner. This was not a business relationship where the respondent had contributed a substantial amount of assets to the LLC. He had contributed none. All the risk of loss was on P.M. The hearing panel accepts the respondent's stipulations and concludes that the respondent violated KRPC 1.8(a).

"KRPC 1.15

"59.    Lawyers must safeguard client's property. KRPC 1.15. In this case, the respondent failed to properly safeguard P.M.'s property—he was unable to account for at least $65,364 or as much as $169,653. Based upon the respondent's failure to properly account for P.M.'s funds, the hearing panel concludes that the respondent violated KRPC 1.15.

"60.    Additionally, the respondent violated KRPC 1.15 in two additional ways. According to KRPC 1.15(a):

'A lawyer shall hold property of clients or third persons that is in a
lawyer's possession in connection with a representation separate from the
lawyer's own property. Funds shall be kept in a separate account
maintained in the state of Kansas. Other property shall be identified as
such and appropriately safeguarded. Complete records of such account
funds and other property shall be kept by the lawyer and shall be

18

preserved for a period of five years after termination of the representation.'

From the time the respondent established Madden Ventures, LLC, in 2009, and continuing into 2012, the respondent maintained Madden Ventures, LLC, funds in his attorney trust account. The respondent was an owner of Madden Ventures, LLC. Additionally, the respondent maintained other clients' funds, his own personal funds, and funds of the Rankin Family Farm in the account. Thus, the respondent commingled his funds with those of his clients in his attorney trust account. Further, the respondent failed to keep complete records of his attorney trust account by failing to maintain invoices which related to his representation of P.M. The manner in which the respondent kept records and accounted for P.M.'s money in his trust account, pales in comparison to the standards expected of attorneys when handling client funds. The extraordinarily difficult task experienced by the respondent, Larry Pfannenstiel, Mr. Sewell, or the disciplinary administrator to account for P.M.'s money is the reason the exacting standards required for client trust accounts were imposed. Accordingly, the hearing panel concludes that the respondent violated KRPC 1.15(a) by commingling his funds with his client's funds and by failing to maintain proper records.

"KRPC 8.4

"61.     'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation [and to] engage in any other conduct that adversely reflects on the lawyer's fitness to practice law.' KRPC 8.4(c) and KRPC 8.4(g). The respondent engaged in conduct that involved dishonesty and adversely reflected on his fitness to practice law when he back-dated billing records in 2012 to attempt to justify the transfer of $60,000 to him in 2010. Further, the respondent engaged in conduct that involved dishonesty and adversely reflected on his fitness to practice law when he transferred the Donahey property from Madden Ventures, LLC to himself without the knowledge or permission of P.M. The respondent engaged in a number of transactions, which, when considering each individually may not be inappropriate on its own accord, but become self-serving and self-enriching when considering the totality of the circumstances and the amount of funds involved over a period of time from 2008

19

through 2012. The respondent had total control over P.M.'s money and other assets, while acting as P.M.'s attorney, business partner, and close personal friend. The conduct was detrimental to his client and troubling to the panel. Thus, the hearing panel concludes that the respondent violated KRPC 8.4(c) and KRPC 8.4(g).

"*American Bar Association*
*Standards for Imposing Lawyer Sanctions*

"62.     In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"63.     *Duty Violated.*  The respondent violated three duties owed to his client. First, the respondent violated his duty to properly safeguard his client's property. Next, the respondent violated his duty to charge reasonable attorney fees. Finally, the respondent violated his duty to his client to refrain from engaging in conflicts of interest. In addition, to violating duties owed to his client, the respondent also violated his duty to the public and to the legal profession to maintain his personal integrity.

"64.     *Mental State.*  The respondent knowingly violated his duties.

"65.     *Injury.*  As a result of the respondent's misconduct, the respondent caused actual serious injury to P.M. and to the legal profession.

"Aggravating and Mitigating Factors

"66.     Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

20

"67.   *Dishonest or Selfish Motive.*  The respondent's misconduct included both dishonest conduct and selfish conduct. The hearing panel concludes, therefore, that the respondent's misconduct was motivated by both dishonesty and selfishness.

"68.   *A Pattern of Misconduct.*  Over a period of years, the respondent failed to properly safeguard and account for P.M.'s property. Additionally, the respondent's conflicts of interest also spanned years. Thus, the hearing panel concludes that the respondent engaged in a pattern of misconduct.

"69.   *Multiple Offenses.*  The respondent committed multiple rule violations. The respondent violated KRPC 1.5, KRPC 1.7, KRPC 1.8, KRPC 1.15, and KRPC 8.4. Further, the respondent violated some of the rules in multiple ways. Accordingly, the hearing panel concludes that the respondent's committed multiple offenses.

"70.   *Refusal to Acknowledge Wrongful Nature of Conduct.*  The respondent has refused to acknowledge that he violated KRPC 1.5, KRPC 1.7, KRPC 1.15, and KRPC 8.4. The respondent, however, acknowledged that his conduct violated KRPC 1.8. Accordingly, the hearing panel concludes that the respondent refused to completely acknowledge the wrongful nature of his conduct.

"71.   *Vulnerability of Victim.*  P.M. was vulnerable to the respondent's misconduct if only because she had misplaced her trust in the respondent. She was often traveling and relied on the respondent to manage her affairs. The respondent testified P.M. was sharp, witty, and active all the time. He also testified P.M. was not a sophisticated client. Finally, the respondent referred to P.M. as 'a lonely woman scared of being alone.'

"72.   Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

21

"73.     *Absence of a Prior Disciplinary Record*. The respondent has not previously been disciplined.

"74.     *Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends, and Lawyers in Support of the Character and General Reputation of the Attorney*. The respondent is an active and productive member of the bar of Fredonia, Kansas. The respondent also enjoys the respect of his peers and generally possesses a good character and reputation as evidenced by many letters received by the hearing panel. The hearing panel would recognize that the support letters are from members of the public, former or current clients, distinguished members of the bar, prosecutors, and a retired District Court Judge. All found the respondent to be a caring, professional attorney, who practices law honestly and with high ethical standards. Many of the letters emphatically emphasize the respondent's outstanding, uncompromising character, and his adherence to personal and community values beyond reproach. It is difficult for the hearing panel to perceive the person praised in the support letters to be the same person who engaged in the conduct giving rise to the instant disciplinary case.

"75.     In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'4.12     Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client.

'4.32     Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client.

'4.62     Suspension is generally appropriate when a lawyer knowingly deceives a client, and causes injury or potential injury to the client.

22

'5.11(b) Disbarment is generally appropriate when . . . a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.'

"*Recommendation*

"76.     The disciplinary administrator recommended that the respondent be disbarred. Counsel for the respondent characterized the matter as an atrocious record keeping situation, and recommended that the respondent be censured and that the censure be published in the Kansas Reports.

"77.     The hearing panel is called upon to weigh the evidence, determine credibility, and assess the tone and quality of each witnesses' testimony. In the hearing panel's observation, it appeared that the respondent was cavalier in his approach and he failed to grasp the gravity of his failure to adhere to the applicable sections of the KRPC. Overall, it appeared that the respondent failed to appreciate the situation in which he now finds himself and, more importantly, he failed to understand the substantial injury he caused to P.M. and to the legal profession as a whole by his egregious misconduct. The hearing panel is troubled by the respondent's attitude.

"78.     The nature of the respondent's misconduct is very extreme and disbarment is warranted. However, because the respondent has not previously been disciplined, the hearing panel recommends that the Supreme Court indefinitely suspend the respondent's license to practice law in Kansas.

"79.     Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the disciplinary panel's findings, and the parties' arguments to determine whether KRPC violations exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2014 Kan. Ct. R. Annot. 363). Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

Respondent was given adequate notice of the formal complaint, to which he filed an answer. As noted, respondent filed no exceptions to the final hearing report. As such, the panel's findings of fact are deemed admitted. Supreme Court Rule 212(c) and (d) (2014 Kan. Ct. R. Annot. 383).

The evidence before the hearing panel establishes by clear and convincing evidence the charged misconduct violated KRPC 1.5(a) and (b) (2014 Kan. Ct. R. Annot. 515) (fees); 1.7(a)(2) (2014 Kan. Ct. R. Annot. 531) (conflict of interest); 1.8(a) (2014 Kan. Ct. R. Annot. 542) (conflict of interest); 1.15(a) (2014 Kan. Ct. R. Annot. 567) (safekeeping property); and 8.4(c) (2014 Kan. Ct. R. Annot. 680) (engaging in conduct involving misrepresentation) and (g) (engaging in conduct adversely reflecting on lawyer's fitness to practice law). The evidence also supports the panel's conclusions of law. We adopt the panel's conclusions.

The only remaining issue for this court is determining the appropriate discipline for respondent's violations. At the hearing before this court, the office of the Disciplinary Administrator recommended respondent's disbarment. The respondent recommended a

finite 2-year suspension, subject to a reinstatement hearing. The hearing panel recommended respondent be indefinitely suspended. The hearing panel's recommendations are advisory only and do not prevent us from imposing greater or lesser sanctions. Supreme Court Rule 212(f) (2014 Kan. Ct. R. Annot. 383); see *In re Kline*, 298 Kan. 96, 212-13, 311 P.3d 321 (2013).

After careful consideration, a majority of the court agrees with the office of Disciplinary Administrator that disbarment is the appropriate sanction. The facts, which are undisputed before this court, show a flagrant pattern of misrepresentation, conflict of interest, and exploitation of a vulnerable client over a number of years, all of which resulted in a substantial loss of the client's property. This is not simply a matter of "atrocious" record keeping, as the respondent characterized it. A minority of the court would follow the hearing panel's recommendation of indefinite suspension.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Rustin K. Rankin be disbarred from the practice of law in the state of Kansas, effective on the filing of this opinion, in accordance with Supreme Court Rule 203(a)(1) (2014 Kan. Ct. R. Annot. 306).

IT IS FURTHER ORDERED that respondent shall comply with Supreme Court Rule 218 (2014 Kan. Ct. R. Annot. 414).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.